# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>MILTON WESTLEY, CLIFFORD BRODIE,<br>SEDALE PERVIS, DEJUAN WARD, MICHAEL<br>BELLE, MICHAEL VIA | No. 3:17-CR-171 (MPS) |

## RULING ON DEFENDANT PERVIS'S MOTION TO SUPPRESS (ECF NO. 74)

### I.        Background

Following an investigation into several shootings in New Haven occurring in 2016, a grand jury returned an indictment charging six individuals with RICO conspiracy, violent crimes in aid of racketeering ("VCAR"), offenses related to possession, transfer, and use of firearms, and possession with intent to distribute narcotics. (ECF No. 1.) One of these individuals, Sedale Pervis, who is charged with RICO conspiracy, firearms offenses, and possession with intent to distribute marijuana, has moved to suppress evidence found in his home after law enforcement arrested him there and later obtained a search warrant. Mr. Pervis argues that the officers violated the Fourth Amendment's "knock-and-announce" requirement in forcibly entering his home to effectuate his arrest. He also argues that the subsequently issued search warrant was not supported by probable cause and was unconstitutionally overbroad.

After considering the evidence introduced at a suppression hearing held on April 24, 2018, I find that the police announced their presence and purpose while Mr. Pervis was outside his home in a manner that Mr. Pervis heard and understood, and that their efforts to gain entry after he retreated into the home otherwise complied with the knock-and-announce rule. Even if they violated the knock-and-announce rule, however, I would find both that knocking and announcing in this case would have been futile and that exigent circumstances existed that excused their

compliance with the rule. Finally, I find that the search warrant was supported by probable cause and that, even if it was overbroad, the officers relied in good faith on the warrant. As explained in more detail below, I therefore DENY Mr. Pervis's motion to suppress.

## II. Evidence at Hearing

At the evidentiary hearing, the government called as witnesses Detective Ryan Macuirzynski, Lieutenant John Healy, and Detective John Folch, all of the New Haven Police Department's Shooting Task Force. Mr. Pervis called his friend and neighbor, Darius Lewis. The parties also introduced affidavits, search and arrest warrants, and photographs. The evidence introduced at the hearing is summarized below.

### A. Officers Obtain an Arrest Warrant For Mr. Pervis

On the evening of August 18, 2016, officers from the New Haven Police Department responded to a domestic dispute. The caller told the dispatcher that the dispute was violent, and the dispatcher heard screaming through the open phone line. Lieutenant Minardi of the New Haven Police Department went to the scene of the dispute and spoke to the complainant, who told him that a black male wearing dark jeans and a white shirt had been involved. Lieutenant Minardi went to the location at which the complainant said he or she had last seen the individual and saw a male matching the description provided. He attempted to speak with the individual, later identified as Mr. Pervis, but the individual fled on foot and hopped a fence separating a basketball court from houses on Morris Street. Dispatch later received a call from a resident on Morris Street who said that someone had placed an item inside an oven that was in her backyard. The caller provided a description of an individual that matched the description given by the complainant. Other residents of Morris Street told officers that they, too, saw a male place an object in the oven.

Officers spoke with the neighbor whose backyard contained the oven, and she allowed them to look inside it. Inside, the officers found a black Smith and Wesson Bodyguard .380 semi-automatic pistol with six live rounds in the magazine and chamber. The neighbor provided the officers with video surveillance footage of her backyard, which showed a male matching the previously given descriptions climb over her fence and into the backyard. A canopy blocked the camera's view of the oven, but the individual could be seen running out from under the canopy and toward the front of the house moments later. Officers compared the individual in the footage to the description of the individual who fled on foot from Lieutenant Minardi and concluded that they likely were the same person, Mr. Pervis. The officers later determined that Mr. Pervis did not have a Connecticut pistol permit.

Based on these events, the officers applied for and obtained an arrest warrant for Mr. Pervis from the New Haven Superior Court. The Information attached to the arrest warrant application charged Mr. Pervis with breach of peace in the second degree, interfering with a police officer, and criminal trespass in the third degree, all misdemeanors under Connecticut law, and carrying a pistol without a permit, a felony under Connecticut law. (ECF No. 74-1 at 21-22.)

Later testing of the recovered gun revealed signs that it was linked to five shootings in New Haven in 2016. (ECF No. 74-1 at 29.) Using the National Integrated Ballistic Information Network ("NIBIN") chart, investigators from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") and the New Haven Police Department's Shooting Task Force and Criminal Intelligence Unit determined that the gun was used in shootings between rival groups in New Haven. Through additional investigation, including conversations with confidential informants, law enforcement came to believe that Mr. Pervis, also known as "Scope," was a member of one of the groups alleged to have committed these acts of violence, "GSB," and was supplying firearms to other members

of the group. Investigators believed that other members of GSB included Mr. Pervis's five co-defendants in this case. Use of the NIBIN chart also led law enforcement to believe that at least two other guns connected to GSB and those acts of violence remained unrecovered. One of those guns, a nine-millimeter firearm, was ultimately recovered in the search Mr. Pervis challenges here.

### B. Officers Execute the Arrest Warrant

On the afternoon of September 2, 2016, members of the Shooting Task Force and the ATF executed the arrest warrant at an address they believed, based on police databases, was Mr. Pervis's home, the first floor of a three-floor residence at 1536 Ella T. Grasso Boulevard in New Haven.

The officers, dressed in plain clothes, conducted covert surveillance of the residence by sitting in two parked, unmarked cars on Ella T. Grasso Boulevard, from which they could see the house. Detective Macuirzynski recalled that it was a sunny day with clear visibility. He had with him a vest marked "POLICE" along its width, in addition to his radio, firearm, and badge. He wore his badge on a necklace underneath his shirt. Detective Macuirzynski testified that he had his vest thrown over the back of his seat in the car so that he could easily access and put on the vest when it was time to leave the car. He testified that he had been given instructions to have his vest with him whenever conducting surveillance. He did not wear his vest while in the car, however, as he wanted to get as close to the residence as possible without revealing his identity as a law enforcement officer. He noted that while the windows of the car he sat in were heavily tinted, a person could see inside the car through the front windshield. Lieutenant Healy similarly testified that he typically keeps his vest slung around his seat so that he can put it on quickly if necessary.

Detective Macuirzynski testified that he was told by his commander to wait until Mr. Pervis came outside of the house to execute the arrest warrant. He testified that this was due in part to law enforcement's understanding of GSB's association with violence and of the two unaccounted-

for firearms. He testified that they "did not want to create a dangerous situation." The officers knew what Mr. Pervis looked like from photos that they had of him. During the hour the officers were waiting in parked cars, Detective Macuirzynski used binoculars to watch several people—none of whom was identified to be Mr. Pervis—enter and leave the premises.

Meanwhile, three of Mr. Pervis's friends, Darius Lewis, Michael Sherman, and Trayzon Sherman, were visiting Mr. Pervis at his home. (Affidavit of Darius Lewis, ECF No. 74-1 at 16 ¶ 4.) At some point in the early afternoon, a car accident occurred in the street in front of the house. After hearing the noise, the four friends exited the front door onto the porch to see what had happened. (*Id.* ¶¶ 5-6.)

After Mr. Pervis came outside of the house, the officers identified him standing on the porch and exited their cars to approach him. Lieutenant Healy testified that he and Detective Macuirzynski approached from one side of the house while three other officers approached from the other. Detective Macuirzynski testified that he believed he had his vest on as he walked toward the house, and recalled that he had his badge displayed.[1] Lieutenant Healy testified that as the officers came within a couple of houses of the residence, Mr. Pervis looked directly at them. At that moment, the officers announced "police." Lieutenant Healy also believed that they told Mr. Pervis that they had a warrant for his arrest, and at that moment, Mr. Pervis "clearly identified" them as police. According to Lieutenant Healy, Mr. Pervis "started backing up, got wide-eyed,

---

[1] The affidavit Detective Macuirzynski and Lieutenant Healy submitted in support of the search warrant application stated that the officers executing the arrest "were clad in plain clothes, with badges visible," and did not mention vests that read "POLICE." (ECF No. 74-1 at 30.) Detective Macuirzynski testified that he could not recall precisely whether he had his vest on, but believed he did to the best of his knowledge. Lieutenant Healy testified that he does not typically include in a police report whether he was wearing his vest. Detective Macuirzynski testified that photos taken of him on that day depicted him without a vest on because he had likely taken the vest off after Mr. Pervis was taken into custody.

and as soon as [they] . . . announced that [they were] the police and had a warrant, he took off." On cross-examination, Lieutenant Healy again testified that the officers "identified [them]selves, [Mr. Pervis] acknowledged it and turned and ran from [them] into the home." Detective Folch also testified that he began yelling "police" as he approached the house.

Detective Macuirzynski also testified: "[W]hen I got close to Mr. Pervis, . . . it was approximately two houses up, a house up, somewhere in between those two, I looked directly at Mr. Pervis, we identified ourselves as police officers. I said, 'Police. Sedale, you have a warrant.'" When asked if he knew if Mr. Pervis heard him, Detective Macuirzynski testified that he saw Mr. Pervis "look directly at us" before he turned and ran into the house, while the three visitors remained outside on the porch. On cross-examination, Detective Macuirzynski said he did not remember exactly where he was when he announced "police," but said that he yelled "police" as they got closer to the house. He admitted that he did not remember the exact words he used but informed Mr. Pervis that they had a warrant, saying something like, "Sedale, you have a warrant." Detective Macuirzynski reiterated that it was "right after" Mr. Pervis heard him say "police" and that they had a warrant that Mr. Pervis ran into the house.

Detective Folch's testimony was similar. He testified that after recognizing Mr. Pervis on the porch, he exited the vehicle and began walking towards the house. He saw Lieutenant Healy approaching as well. He saw Mr. Pervis "look up," and he immediately yelled "police." Mr. Pervis then ran into the house and slammed the door.

At that point, Lieutenant Healy ran after Mr. Pervis toward the front of the house, continuing to yell "police." Lieutenant Healy testified that he did so because he feared Mr. Pervis, who officers believed had supplied guns to other GSB members, would go into the house and retrieve a gun. (Detective Macuirzynski testified that as he ran towards the back of the house, he

was pointing his gun at the windows due to the same concern about Mr. Pervis.) Once on the porch, Lieutenant Healy tried to open the front door to Number 1536 and found that it was locked. He kicked the door two times. He then asked the three visitors on the porch whether they had a key to the door, but they did not respond. He then kicked the door again, after which it opened.

Meanwhile, three of the officers, including Detective Macuirzynski, ran to the back of the residence. From the rear of the house, Detective Macuirzynski heard Lieutenant Healy yell "police." He then heard a noise that sounded like footsteps running up toward the second floor. Detective Macuirzynski heard a loud bang, which he believed was the door to the second floor slamming shut.

Mr. Pervis's friend Darius Lewis testified that he remembered the officers' approach to the house differently. According to Lewis's testimony and his affidavit dated December 12, 2017, as he stood and watched the aftermath of the car accident in the street, he heard Mr. Pervis reenter the house and shut the front door behind him. Lewis attested that after the front door was shut, he saw two white males in street clothes approaching and he wondered whether they might have been involved in the accident that had just occurred. He testified on direct examination that he did not see that the individuals had badges, that they wore street clothes, and that he never saw vests marked "POLICE." (On cross-examination, Lewis said he saw badges later.) Then, as they got closer, Lewis saw more individuals rushing toward the porch. "At some point, [he] heard someone yell what sounded to [him] to be the word 'police.'" (ECF No. 74-1 at 17.) One of the individuals also asked, "Why did Sedale run?" It eventually became clear to Lewis that the individuals were police officers. The officers told Lewis and the two Shermans to stand off to the side of the porch along the driveway of the house. Lewis watched as officers ran to the back door of the residence and another officer began kicking in the front door of the house. Lewis attested that, "[a]t no time,

prior to the officer kicking in Sedale's front door, did any officer, especially the one doing the kicking, first knock on the door, announce, in a voice loud enough to be heard by someone inside Sedale's residence, that the police were there to execute an arrest warrant, and that he (Sedale) should voluntarily open his door so that the police would not have to kick it in." (ECF No. 74-1 at 18.)

Once inside, Lieutenant Healy's team searched for Mr. Pervis on the first floor. While searching, they found that the rear common staircase had access to a common basement, which they later confirmed was accessible to Mr. Pervis as a resident of the first floor. The officers descended into the basement to search for Mr. Pervis. They did not find him or anyone else on the first floor or in the basement. While searching for Mr. Pervis on the first floor, officers saw digital scales in the closet and on the couch, zip lock baggies, and razor blades.[2] Based on their training and experience, the officers believed that these items were materials used to package narcotics for sale. (ECF No. 74-1 at 30.) At the same time, the officers remaining outside set up a perimeter around the building.

While Lieutenant Healy and his team entered the house, Detective Macuirzynski returned to the front of the house and entered the door on the right-hand side of the porch, marked 1538 Ella T. Grasso Boulevard. He went up the common staircase of Number 1538 and met Detective Folch on the second floor landing. The officers knocked on the door with their firearms drawn, yelling "police" multiple times and stating that they had a warrant for Mr. Pervis's arrest. Hearing

---

[2] Lieutenant Healy testified that he saw a scale and "packaging" in a bedroom closet, and that another officer saw a scale on a couch. Mr. Lewis testified that he had not seen scales, baggies, or razors in Mr. Pervis's home that day. Detective Folch also testified that he did not see scales, baggies, or razors in Mr. Pervis's home during the protective sweep. The search warrant affidavit, which was signed by Lieutenant Healy and Detective Macuirzynski, states: "[W]hile searching for Pervis within the residence, NHPD Officers observed digital scales, zip lock baggies, and razor blades, consistent with street level drug packaging for sale." (ECF No. 74-1 at 30.)

footsteps and movement and believing he was inside the second-floor apartment, the officers asked Mr. Pervis to surrender. They did not enter the second-floor apartment. After a "prolonged period of time," Mr. Pervis said that he would come out. He came out of the front door of the second-floor residence and was handcuffed. After bringing him outside to the patrol car, the officers searched Mr. Pervis's person. The officers later seized a pink cell phone from Mr. Pervis.[3]

### C. Officers Obtain and Execute a Search Warrant

After completing the arrest and securing the premises, law enforcement officers applied for and obtained from the New Haven Superior Court a search warrant for the first floor and basement of 1536 Ella T. Grasso Boulevard, based on what they observed during the protective sweep.[4] The warrant authorized the search and seizure of the following items:

> Narcotics/Controlled Substances, packaging materials, scales, drug paraphernalia, monies and proceeds of narcotic transactions, cutting agents, records o[f] narcotics transactions, firearms and ammunition, photographs or video tapes depicting drug related activity, safety deposit box keys and/or records, bank records, bank books, proof of residence, telephone toll records, cell phones, records of cell phone transactions, purchases and leases, telephone numbers, pictures[] and data stored within cell phones at the time of seizure, notebooks, ledgers or pieces of paper containing telephone numbers and/or names of co-conspirators.

(ECF No. 74-1 at 34.)

As a result of the search, officers seized from various locations throughout the first-floor residence seventeen cell phones, marijuana and drug paraphernalia, a .357 pellet gun, a Ruger P85 handgun, and ammunition. Officers later obtained a separate search warrant to search the contents of Mr. Pervis's pink cell phone.

### III. Analysis

---

[3] Mr. Pervis filed a supplemental motion to suppress all evidence derived from the "pink cell phone." (ECF No. 115.) Mr. Pervis's counsel withdrew that motion at the April 24, 2018 hearing.
[4] Detective Macuirzynski testified that before September 2, 2016, the officers had no reliable information connecting Mr. Pervis's residence to drug trafficking.

### a. Burden of Proof

"It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing. The movant can shift the burden of persuasion to the Government and require it to justify its search, however, when the search was conducted without a warrant." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980). Here, the officers were equipped with an arrest warrant, which creates the same effect as a search warrant for the purpose of assigning the evidentiary burden. *Id*. As I held in another case involving an alleged violation of the knock-and-announce rule in the course of executing an arrest warrant, Mr. Pervis must prove by a preponderance of the evidence that the officers violated the knock-and-announce rule. *See United States v. Vasquez*, No. 15-CR-119 (MPS), 2016 WL 3102317, at *7-8 (D. Conn. June 2, 2016).[5] *See also United States v. Hromada*, 49 F.3d 685, 689 n.7 (11th Cir. 1995) ("The defendant has the burden of establishing a prima facie case that a knock and announce violation has occurred under § 3109 and overcoming the presumption of Government's propriety."); *United States v. Schenk*, 983 F.2d 876, 878 (8th Cir. 1993) (same); *United States v. Murrie*, 534 F.2d 695, 698 (6th Cir. 1976) (holding that the district court erred in failing to place the burden of proof upon the government where the defendant had made a prima facie case of a violation of the knock-and-announce rule).

The government has the burden to establish by a preponderance of the evidence any exceptions to the knock-and-announce rule, such as the existence of exigent circumstances. *Id*. ("Clearly where police officers in breaking into a home . . . have violated a constitutional standard,

---

[5] Although the Supreme Court held in *Hudson v. Michigan*, 547 U.S. 586 (2006), that the exclusionary rule does not apply to a knock-and-announce violation committed during the execution of a *search* warrant at a home, I have previously determined that it does apply to the execution of an *arrest* warrant at the suspect's home, adopting the reasoning of *United States v. Weaver*, 808 F.3d 26 (D.C. Cir. 2015). *See Vasquez*, 2016 WL 3102317, at *14.

the burden of proof of exigent or exceptional circumstances to justify such a deviation from the Fourth Amendment is upon those who are seeking the advantage of the exception.").

### b. The Knock-and-Announce Rule

The Supreme Court has held that "the method of an officer's entry into a dwelling" is "among the factors to be considered in assessing the reasonableness of a search or seizure" under the Fourth Amendment. *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). "It is clearly established that, absent exigent circumstances, the Fourth Amendment requires officers executing a . . . warrant to knock at the entrance of the premises to be searched and to announce their presence. Absent exigency, the police must give an occupant a reasonable time to reach the door, a time that will vary with the size of the establishment . . . ." *Terebesi v. Torreso*, 764 F.3d 217, 241 (2d Cir. 2014) (citation and internal quotation marks omitted). The rule applies whether the police are executing a search warrant or an arrest warrant of a suspect located in a dwelling. *Wilson*, 514 U.S. at 935 (although "at the time of the framing, the common-law admonition that an officer ought to signify the cause of his coming had not been extended conclusively to the context of felony arrests[,] . . . [t]he common-law principle gradually was applied to cases involving felonies . . . .") (citations and internal quotation marks omitted).

The Supreme Court has made clear that the rule "is one focus of the reasonableness enquiry" under the Fourth Amendment, and thus does not apply when the circumstances would make demanding compliance with the rule unreasonable. "[A]lthough the standard generally requires the police to announce their intent to search before entering closed premises, the obligation gives way when officers have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or would inhibit

the effective investigation of the crime by, for example, allowing the destruction of evidence." *United States v. Banks*, 540 U.S. 31, 36 (2003) (internal quotation marks and alterations omitted).

I find that no violation of the knock-and-announce rule occurred here because I find from the evidence introduced at the hearing that the officers announced their presence and purpose while Mr. Pervis was still on the front porch and, to the extent a knock was required, Lieutenant Healy knocked before entering by kicking the door with his feet twice. I find the testimony of Detective Macuirzynski, Lieutenant Healy, and Detective Folch credible, as the officers consistently testified that they yelled the word "police" multiple times as they approached the residence, while Mr. Pervis was outside on the porch. They also testified that their badges were visible and that it is their usual practice to put on their vests, marked with the word "POLICE," before executing an arrest after conducting surveillance in unmarked cars and while dressed in plain clothes. I find no reason to believe they did not follow that practice when executing the arrest warrant on Mr. Pervis, and I find credible their explanation that the photos introduced by the defendant, which do not show them with vests, were taken later, after the situation had stabilized and they had removed their vests. Moreover, Detective Macuirzynski testified that he informed Mr. Pervis while he was outside that they had a warrant for his arrest. I credit this testimony as well, as it is consistent with the officers' plan of waiting until Mr. Pervis emerged from the house to arrest him, a plan that was reasonably aimed at minimizing the risk of physical injury and reasonably based on the officers' previous experience with Mr. Pervis and other information they had received about him. Detective Macuirzynski, Lieutenant Healy, and Detective Folch also recalled that Mr. Pervis looked directly at them or "looked up" before backing away, turning around, and entering the house, which the officers reasonably understood to mean that Mr. Pervis knew why they were there and which was consistent with Mr. Pervis's actions during his encounter with the police two weeks earlier.

Lieutenant Healy also testified that he kicked the door twice—and that he and other officers had shouted "police"—before asking Mr. Pervis's friends on the porch if they had a key.[6] (Detective Folch likewise testified that Lieutenant Healy asked for a key.) It was not until Mr. Pervis's friends failed to respond to Lieutenant Healy's query about a key that Healy kicked the door open.

I also find Mr. Lewis's testimony less than credible. He provided an affidavit more than fifteen months after the date of the arrest. His testimony and affidavit improbably suggest that even when Lieutenant Healy was kicking at the front door, he did not say the word "police." On cross-examination, he changed his initial statement that he did not see badges. He combatively responded to the government's cross-examination, refusing to answer questions about alleged text messages he sent to Mr. Pervis that appeared to have discussed drug sales and maintaining that texts about "need[ing] a bag" and an "eighth" and having a "trap" "could be about anything," and "could be about a video game." He had reason to lie about Mr. Pervis's potential involvement with narcotics trafficking (for example, about whether he saw scales or razor blades in Mr. Pervis's house), because he was on probation in September 2016 and might have been re-imprisoned if found to be involved with drugs. He testified that he had four previous felony drug convictions.

As the officers credibly testified that they announced their presence and purpose in a manner that Mr. Pervis heard and understood before he went back inside the house, Mr. Pervis has not met his burden of demonstrating that the officers violated the knock-and-announce rule.

## IV. Futility and Exigent Circumstances

---

[6] Those two kicks qualify as a "knock" for purposes of the rule, in that they signaled to those inside that the police were at the door, but did not forcibly open the door. Mr. Pervis does not specifically challenge the amount of time Lieutenant Healy waited between kicking the door twice and kicking the door open.

Even if I had found that the officers violated the knock-and-announce rule, however, I would have found that futility and exigent circumstances excused compliance with the rule. "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence . . . . This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Richards v. Wisconsin*, 520 U.S. 385, 394-95 (1997).

## A. Futility

Construing the futility exception outlined in *Wilson* and *Richards*, the Second Circuit explained that futility occurs "when the circumstances indicate that the inhabitants are well aware of the officers' presence." *United States v. Acosta*, 502 F.3d 54, 59 (2d Cir. 2007) (analyzing an alleged violation of the federal statutory knock-and-announce rule under Fourth Amendment principles). Similarly, the Fifth Circuit has held, in light of the "privacy interests protected by the rule," that futility "justifies a no-knock entry only when the officer has a reasonable suspicion that the *occupants* of the residence to be searched are already aware of the officer's presence." *Trent v. Wade*, 776 F.3d 368, 380 (5th Cir. 2015). The Seventh Circuit has stated that the futility exception applies "if the occupant consented to entry, or was not there to consent to entry, or recognized the officers and attempted to bar their entry." *Green v. Butler*, 420 F.3d 689, 701 (7th Cir. 2005). Under these formulations, the officers in this case, who testified that they shouted "police" and "Sedale, you have a warrant" before Mr. Pervis backed away from them while "looking at [them]" and went inside the house, reasonably believed that knocking and announcing their presence would have

been futile, as Mr. Pervis was already on notice that the officers were there to arrest him.[7] The reasonableness of their belief is further supported by their encounter with Mr. Pervis two weeks earlier—in which he had similarly fled their presence.

## B. Exigent Circumstances

The Second Circuit has outlined six factors to consider when determining the existence of exigent circumstances: (1) "the gravity or violent nature of the offense with which the suspect is to be charged;" (2) "whether the suspect is reasonably believed to be armed;" (3) "a clear showing of probable cause to believe that the suspect committed the crime;" (4) "strong reason to believe that the suspect is in the premises being entered;" (5) "a likelihood that the suspect will escape if not swiftly apprehended;" and (6) "the peaceful circumstances of the entry." *Terebesi*, 764 F.3d at 241. Courts also take into account whether "quick action is necessary to prevent the destruction of evidence." *Id.* at 242 (internal quotation marks omitted). "No one factor is dispositive, and the list . . . is merely illustrative, not exhaustive." *Id.* (internal quotation marks omitted). The exigent circumstances standard is an objective one, based on the totality of the circumstances. *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc).

A canvass of these six factors, as well as the potential for destruction of evidence, supports a finding of exigent circumstances. First, the offenses with which Mr. Pervis was charged were arguably serious but not violent. He was charged with three misdemeanors arising from a domestic

---

[7] Unlike in civil cases in which multiple inhabitants of a residence challenge an alleged violation of a knock-and-announce rule in order to obtain damages, *see, e.g.*, *Trent*, 776 F.3d at 379-80, I need not consider whether the officers' entry affected the rights of other inhabitants of 1536 Ella T. Grasso Boulevard. The relief Mr. Pervis seeks—suppression of evidence in a criminal case brought against him—does not implicate the privacy interests of those other inhabitants, and Mr. Pervis lacks standing to assert the interests of those inhabitants. In any event, the police reasonably believed that the occupants of the first floor had exited to the front porch to view the car accident, and after the police entered, they found no one in the first floor apartment or the basement.

dispute and the fact that he fled from the police following the dispute, in addition to a felony for possession of a firearm without a permit.

Second, the officers reasonably believed Mr. Pervis was armed. Though Mr. Pervis points out that the only gun linked to him—the gun he reportedly hid in the oven and became the basis for the felony charge of possession of a firearm without a permit—had already been recovered, officers had additional information that Mr. Pervis had been providing firearms to other members of GSB. The officers had information that the gun Mr. Pervis had hidden in the oven was linked to five shootings in New Haven in a single year, and that two other firearms linked to certain of those shootings, a nine-millimeter handgun and a .22-caliber handgun, remained unrecovered. The officers also had information that Mr. Pervis had a firearm in his possession while he was involved in a domestic dispute. Therefore, it was reasonable for officers to suspect that Mr. Pervis would have other firearms in his home, a suspicion that turned out to be correct. *See Richards*, 520 U.S. at 394-95 (requiring only a "reasonable *suspicion* that knocking and announcing . . . would be dangerous") (emphasis added).

Third, the officers had a clear showing of probable cause to believe that Mr. Pervis committed the crimes charged in the information. Mr. Pervis engaged Lieutenant Minardi in a foot pursuit, and several witnesses linked Mr. Pervis to the domestic dispute and the firearm left in the oven on Morris Street. Officers also viewed video footage that linked Mr. Pervis to the firearm. Moreover, Mr. Pervis turned and ran into the house upon seeing the police, which courts have recognized supports a finding of probable cause. *See United States v. Moreno*, 701 F.3d 64, 74 (2d Cir. 2012) ("[A] hasty retreat into one's home on sight of police manifests guilt and may, in appropriate circumstances, transform suspicion into probable cause."). *But see id.* at 80 (Carney, J., concurring) (noting that it was "difficult to interpret [defendant]'s closing the door with force

as signaling her resistance to the police and foretelling an attempt to destroy evidence" where the officer was dressed in plain clothes and it was not clear whether the defendant saw the officer's badge).

Fourth, the officers had a strong reason to believe that Mr. Pervis was in the premises being entered, as they watched him enter the house as they approached and, at most, minutes before they entered the residence. They then heard footsteps moving through the house and a loud bang, which they believed was Mr. Pervis slamming the door to the second-floor apartment, where he ultimately surrendered.

Fifth, though Mr. Pervis had previously fled from the police, the police had his home surrounded, and therefore the likelihood that he would escape if not swiftly apprehended was low.

Sixth, though the circumstances of the entry were not entirely peaceful, the officers approached the house during the daytime and first attempted to arrest Mr. Pervis outside and then, when he ran inside, attempted to gain peaceful entry before forcing the door open. *See United States v. Cattouse*, 666 F. Supp. 480, 487 (S.D.N.Y. 1987) ("The fact that the entry occurred during daylight hours further supports the reasonableness of the entry, whether or not it was a peaceful one . . . . And even if the agents did eventually force the door, they did attempt to gain peaceful entry first.") The officers waited in unmarked cars intending to arrest Mr. Pervis outside of his home. The officers called out to him to identify themselves and to inform him that they had a warrant. After he went inside, the officers asked Mr. Pervis's friends whether they had a key to the residence and could let them in. All of this suggests that the officers intended to execute the arrest warrant peacefully and only entered the residence because they believed Mr. Pervis had seen them, understood that they were there to arrest him, and sought to avoid arrest by going inside and locking the door.

Further, based on their August 18, 2016 encounter with Mr. Pervis, in which he ran and hid a gun when Lieutenant Minardi tried to approach him, the officers reasonably believed that he may have intended to destroy or hide evidence after he retreated into the house and locked the door after seeing the officers.

Accordingly, even if the officers had violated the knock-and-announce rule, exigent circumstances would have justified the entry.

## V.     Validity of the Search Warrant

### a. Probable Cause for the Issuance of a Search Warrant

Mr. Pervis argues that the warrant application submitted by the officers after they entered the home to arrest Mr. Pervis and performed a protective sweep failed to show probable cause to justify issuance of a search warrant. Specifically, Mr. Pervis argues that the officers' observation of a digital scale, razors, and zip lock bags in the house during the sweep was insufficient to justify issuance of the search warrant.

Probable cause is a "flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). It merely requires the reasonable belief "that certain items may be contraband or stolen property or useful as evidence of a crime." *Id*. Courts "accord great deference to a judge's determination that probable cause exists, and . . . resolve any doubt about the existence of probable cause in favor of upholding the warrant." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) (internal quotation marks omitted). The court's "duty is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id*. (internal quotation marks and alterations omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). Nonetheless, warrant applications may not rely merely on "conclusory statement[s]." *Illinois v. Gates*, 462 U.S. 213, 239 (1983).

The Second Circuit has recognized that items like zip lock bags, digital scales, and razor blades may constitute drug paraphernalia. *See, e.g.*, *United States v. Wilson*, 503 F.3d 195, 198 (2d Cir. 2007) (noting that "drug paraphernalia were found in [defendant's] residences, including a razor and Ziploc bags in baby clothes in her bedroom"); *United States v. Snow*, 462 F.3d 55, 59-60 (2d Cir. 2006) (discussing drug paraphernalia, including scales, balloons, and boxes of sandwich bags); *United States v. Hammett*, 555 Fed. Appx. 108, 110 (2d Cir. 2014) (describing "a digital scale" as among the "tools that drug dealers often possess"). Courts have also noted that drug paraphernalia, on its own, may establish probable cause for the issuance of a search warrant. *See United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (noting that drug paraphernalia, including zip lock bags and scales, among other items, "would be sufficient, even apart from the other evidence that the officers possessed, to support the lawful issuance of a search warrant"). *See also United States v. McManaman*, 673 F.3d 841, 847 (8th Cir. 2012) ("We have previously stated that the existence of drug paraphernalia in or around a suspect's house is significant on the issue of probable cause.") (internal quotation marks omitted).

Mr. Pervis argues that these items are innocuous on their own, that law enforcement observed no narcotics, and that law enforcement had no information at the time they applied for a search warrant that Mr. Pervis sold drugs or that his residence was connected to drug trafficking. It is true that the officers preparing the affidavit could have been more specific about where they found the items and why it was reasonable to believe that the items were being used for drug trafficking and not for innocuous purposes. Indeed, according to Lieutenant Healy's testimony at the hearing, which I found credible, detailing the actual location of those items in the home, e.g., that digital scales were observed on the couch and in a bedroom closet (as opposed to, say, the kitchen), would have bolstered the showing of probable cause here. Nonetheless, the warrant

affidavit in this case does not say merely that the officers observed razor blades, plastic bags, and scales. It says they observed "digital scales, zip lock baggies, and razor blades, *consistent with street level drug packaging for sale*," which suggests that the appearance of these items in the home was not, as the defendant suggests, consistent with their legitimate use as ordinary household items. (ECF No. 74-1 at 30 (emphasis added).) *See United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("[t]he fact that an innocent explanation may be consistent with the facts as alleged . . . does not negate probable cause"). Further, the affidavit states that the officers "kn[ew] through [their] training and experience that persons who sell narcotics have materials which they use to package these illicit narcotics." (ECF No. 74-1 at 30.) *See United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) ("[C]ourts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not."). While the items themselves were "not inherently illegal," the officers provided "a reason to believe" that, in the circumstances in which they were found, they could constitute evidence of a crime. *United States v. Griffith*, 867 F.3d 1265, 1274 (D.C. Cir. 2017). The affidavits were therefore sufficient to show probable cause, which "does not require a prima facie showing" of criminality. *United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005).

### b. Seizure of cell phones

Mr. Pervis also argues that the search warrant application failed to establish probable cause for the seizure of cell phones found in his residence. Relatedly, Mr. Pervis argues that to the extent the search warrant authorized the seizure of all cell phones, it was unconstitutionally overbroad. I need not determine whether probable cause existed for the seizure of the cell phones based on the search warrant affidavit, or whether the search warrant was overbroad as applied to cell phones,

as I find that the good faith exception applies, and therefore that the cell phone evidence seized need not be suppressed.

"Evidence seized pursuant to a warrant for which actual probable cause does not exist or which is technically deficient is admissible if the executing officers relied on the warrant in 'objective good faith.'" *United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). There are four circumstances in which the good-faith exception does not apply: (1) where the issuing judge has been knowingly misled; (2) where the issuing judge wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient such as by failing to particularize the place to be searched or the things to be seized that reliance upon it is unreasonable. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008).

Mr. Pervis relies primarily on *United States v. Griffith*, in which the United States Court of Appeals for the D.C. Circuit held that a search warrant authorizing seizure of all cell phones and electronic devices found in the defendant's residence was unsupported by probable cause, and that the good faith exception did not apply. 867 F.3d 1265 (D.C. Cir. 2017). In *Griffith*, law enforcement obtained a warrant to search the defendant's residence in connection with their investigation of a homicide committed more than one year earlier. Investigators suspected that the defendant had driven the getaway car after the homicide. *Id.* at 1268. The warrant authorized the search and seizure of "all electronic devices" found in the defendant's residence, including all cell phones. The Court held that the warrant affidavit failed to demonstrate probable cause for any of the items sought to be seized, as it conveyed no reason to think that the defendant owned a cell phone, that the cell phone would be likely to be found in his residence, or that any phone would

be likely to contain incriminating evidence. 867 F.3d at 1272-74. The Court also held that the warrant was overbroad in its authorization of the seizure of all electronic devices found in the residence, given the officers' justification for entering the home—to recover any devices owned by the defendant. *Id*. at 1276. Finally, the Court found the good-faith exception inapplicable in part because the affidavit failed to establish probable cause to believe that any cell phone or electronic device containing incriminating information about the defendant's suspected offense would be found in the apartment. *Id*. at 1279. In doing so, the *Griffith* court distinguished another case, *United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir. 1990), which had applied the good-faith exception to an overbroad warrant and "cast no doubt on the existence of probable cause to suspect the presence in the searched residence of at least *some* incriminating items encompassed by the warrant." *Griffith*, 867 F.3d at 1279.

This case is more similar to *Maxwell* than to *Griffith*. As discussed above, the warrant established probable cause to believe that evidence of narcotics offenses, i.e., "at least *some* incriminating items encompassed by the warrant," would be found in Mr. Pervis's residence. Further, the link between narcotics offenses and cell phones is a close one, *see Hammett*, 555 Fed. Appx. at 110 (describing "cell phones" as "tools that drug dealers often possess"); *United States v. Portalla*, 496 F.3d 23, 27 (1st Cir. 2007) (describing cell phones as "essential tools of [the defendant's] drug trade"), much closer than the association between cell phones and homicide, the offense at issue in *Griffith*.[8] In this case, the flaw in the warrant, if any, was its breadth, not that it was so lacking in indicia of probable cause as to be fundamentally defective.

---

[8] Another difference between this case and *Griffith* is the recency of the crime. In *Griffith*, the homicide had occurred over a year before the police sought the warrant, making it even less likely that cell phones found in the defendant's residence would reveal evidence of a crime. *See Griffith*, 867 F.3d at 1274.

Even if the warrant here was overbroad, the good-faith exception saves the seized evidence from suppression, as it was objectively reasonable for the officers to conclude that the superior court judge legitimately authorized a broad search. After securing the residence following execution of the arrest warrant, Detective Macuirzynski and Lieutenant Healy prepared an affidavit detailing Mr. Pervis's suspected offenses based on the investigations conducted by the ATF and the New Haven Shooting Task Force, and the events of August 18, 2016, and September 2, 2016, as to all of which they had personal knowledge. They presented that affidavit to a judge, who determined that probable cause existed before they executed the search warrant. *See Maxwell*, 920 F.2d at 1034.

As the Supreme Court and the Second Circuit have held, an officer is not "required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *United States v. Buck*, 813 F.2d 588, 591 (2d Cir. 1987) (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984)). If the warrant itself had some technical deficiencies, none of these rendered it so deficient as to render the officers' reliance on it unreasonable or in bad faith. While the warrant itself did not specify that the items seized had to be evidence of particular offenses, the affidavit submitted with the warrant application does contain that information. (ECF No. 74-1 at 30 ("[T]he undersigned Affiants believe that narcotics, firearms, and related evidence is within this residence, which would constitute evidence of Possession of a Narcotic Substance with Intent to Sell . . . .").) The warrant also authorized seizure only of specifically described objects (e.g., "firearms and ammunition," "cutting agents," "photographs or video tapes depicting any drug related activity"), rather than providing a catch-all authorization that might have precluded good-faith reliance. *See United States v. Kouzmine*, 921 F. Supp. 1131, 1135 (S.D.N.Y. 1996) (applying the good-faith exception

and distinguishing "general classifications of materials—business records, files, papers, computer hard drives and discs, correspondence and other material"—from a catch-all like "'other evidence relating to the commission of a crime.'"). Further, the warrant specifically described the premises to be searched, limiting the search to the first floor and basement of 1536 Ella T. Grasso Boulevard, and specifically detailed the color and style of the house and the location of the front entrance to this particular unit of the multi-family house. (ECF No. 74-1 at 34.) The warrant was thus not "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers [could not] reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984). Finally, the warrant also authorized only the seizure of any cell phones found, not a search of their content. A separate warrant was applied for and obtained to search for content on the devices themselves, and Mr. Pervis does not challenge the issuance of that warrant by itself. *See Griffith*, 867 F.3d at 1286 (Brown, J., dissenting) (noting that an "additional search warrant was required in order for law enforcement officers to search within [the] devices").

Because the officers acted in good faith and in reasonable reliance on the warrant in seizing the cell phones found at Mr. Pervis's residence, suppression of that evidence is not warranted.

**VI.    Conclusion**

For the reasons discussed above, Mr. Pervis's Motion to Suppress is DENIED.

IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
             July 2, 2018